**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| MAX BLUMENTHAL,<br><br>*Plaintiff,*<br><br>v.<br><br>MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security;*<br>RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection;*<br>RONALD D. VITIELLO, *in his official capacity as Acting Deputy Commissioner of U.S. Customs and Border Protection,*<br><br>*Defendants*. | **COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF**<br><br>JURY TRIAL DEMANDED |

**INTRODUCTORY STATEMENT**

1. This lawsuit is brought by Max Blumenthal, an award-winning independent journalist recognized internationally for bringing attention to the detrimental impacts of U.S. foreign policy in various parts of the world, particularly the Middle East.

2. On July 10, 2026, after returning from a trip he had taken to Iran to cover the funeral of the Ayatollah Ali Khamenei, Mr. Blumenthal's two smartphones were unlawfully seized at Dulles International Airport by the Department of Homeland Security's (DHS)

Customs and Border Protection (CBP). The officers who confiscated his devices informed him that they would be hooked up to devices to extract data.

3. During the time he was in Iran and shortly thereafter, Laura Loomer, an associate of President Trump's and prominent social media influencer, posted numerous times on the social media platform X that Plaintiff should be arrested, falsely suggested that state actors had paid him to visit Iran, and stated without evidence that the Federal Bureau of Investigation (FBI) was investigating him. Ms. Loomer's posts targeting Plaintiff tagged multiple federal agencies and administration officials, including the FBI, Secretary of State Marco Rubio, and Secretary of the Treasury Scott Bessent.

4. Likewise, on July 7, while Plaintiff was still in Iran, Elon Musk—a former Trump administration official who maintains a close relationship with President Trump—amplified X posts accusing Mr. Blumenthal of dedicating his life to advocating for "Antifa, Palestine, Russia, and the Islamic Republic of Iran."

5. Given that prominent individuals who are former officials of the Trump Administration, or close allies of President Trump and his inner circle, participated in this social media campaign against Plaintiff, and that he was then subjected to an unreasonable search and seizure by CBP, there is good reason to believe that the government was targeting and punishing him for his views and journalism—in violation of the First Amendment. Indeed, following the seizure of Plaintiff's phones, Ms. Loomer effectively took credit for the search, boasting that she had personally lobbied the FBI and State Department to arrest and punish Plaintiff for reporting from Iran.

6. Moreover, the Government's seizure of his devices to conduct an advanced forensic search violates the Fourth Amendment: courts in this Circuit hold that such searches require, at the very least, individualized suspicion of criminal activity and possibly a warrant.

7. Likewise, the search violated the Privacy Protection Act, which recognizes the significant privacy interests that journalists possess in their work product materials—which in the modern era obviously includes the content of smartphones.

## JURISDICTION AND VENUE

8. This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the federal law claims arise under the Constitution and statutes of the United States.

9. Venue is proper in this District under § 1391(b)(2) because the events giving rise to the claim occurred in this District.

10. This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

## PARTIES

11. Plaintiff, Max Blumenthal, is a United States citizen and journalist who resides in Reston, Virginia.

12. Defendant, Markwayne Mullin, is the Secretary of DHS. DHS is the agency responsible for public security, particularly when it comes to protecting against threats from outside the United States. He is sued in his official capacity.

13. Defendant Rodney S. Scott is the Commissioner of CBP. CBP, which operates within DHS, is the largest federal law enforcement agency in the country. It is responsible for border management and control, including customs, immigration, and border security.

Commissioner Scott oversees the daily operations of CBP's mission, including matters relating to trade, travel, and national security. He is sued in his official capacity.

14. Defendant, Ronald D. Vitiello, is the Acting Deputy Commissioner for CBP. His duties include overseeing CBP's daily operations, including matters relating to trade, travel, and national security. He is sued in his official capacity.

## STATEMENT OF FACTS

### I. PLAINTIFF'S PERSONAL AND PROFESSIONAL BACKGROUND

15. Plaintiff is a Jewish-American journalist, and a husband and father of two young children.

16. He is well-known for his investigative reporting on U.S. foreign policy. His work is widely commended for highlighting underreported perspectives and criticized for its opposition to U.S. government policy. His journalism career has spanned 25 years.

17. Plaintiff not only writes news articles but is a filmmaker and the author of four books, one of which was a *New York Times* bestseller. He has won several awards, including the Online Journalism Award and the Pierre Sprey Award for Defense Reporting and Analysis.

18. His work has been published in news outlets including *The Nation*, *AlterNet*, *The Daily Beast*, *the Huffington Post*, the *New York Times*, and *Los Angeles Times*. Currently, he serves as Editor of an online news publication he founded known as *The Grayzone*.

19. From 2009 through 2014, Plaintiff spent extensive amounts of time living in Israel and the Occupied Palestinian Territories, including the West Bank and Gaza Strip. He documented his experiences and observations in two widely read and reviewed books: *Goliath: Life and Loathing in Greater Israel* was published in 2013. *The 51 Day War: Ruin and Resistance in Gaza* was published in 2015. He also co-produced a documentary about bearing

witness to Israel's 2014 military assault on the Gaza Strip, *Killing Gaza.* The plaintiff has reported widely from the region, as well as from Latin America, where he has interviewed several presidents and produced numerous reports for *The Grayzone* about the impact of US foreign policy in these regions.

20. Plaintiff's journalism is recognized both in the U.S. and in Israel as highly influential with respect to public perception of the Israel-Palestine conflict. Right now, he has devoted considerable focus to the U.S.'s military conduct in Iran and to global affairs generally.

21. Plaintiff has established a large audience that spans the political spectrum. He and *The Grayzone* have more than one million followers across multiple online platforms, including X, YouTube, Facebook and Instagram. Other journalists and political commentators routinely amplify his news coverage.

22. Plaintiff has been the first journalist to break many stories involving Israel, including Israeli Defense Forces' use of the Hannibal Directive, which authorizes the military to attack Israeli citizens to prevent them from being taken hostage and used as political collateral.

23. While mainstream media outlets initially denied the truth of Plaintiff's reporting on this subject, a few months later, *Haaretz*—a widely read Israeli newspaper—published an article admitting that Israeli army soldiers employed the Hannibal Directive at three different army facilities on October 7. Yaniv Kubovich, *IDF Ordered Hannibal Directive on October 7 to Prevent Hamas Taking Soldiers Captive*, HAARETZ (July 7, 2024), https://shorturl.at/pkhe0 (last visited Aug. 16, 2026).

24. Plaintiff was later given the Pierre Sprey Award for Defense Reporting and Analysis based on this reporting.

25. This year, he is slated to receive an award at the Integrity Media Award Ceremony in September.

## II. CBP'S DIRECTIVE GOVERNING SEARCHES OF TRAVELER'S ELECTRONIC DEVICES AT POINTS OF ENTRY INTO THE UNITED STATES

26. CBP maintains that it has the right to search traveler's electronic devices (phones, computers, cameras) at border crossings to identify and combat, *inter alia,* terrorism, drug smuggling, human trafficking, intellectual property rights violations, and visa fraud. *See Border Search of Electronic Devices at Ports of Entry*, U.S. CUSTOMS AND BORDER PROTECTION, https://shorturl.at/fNrGM (last visited Aug. 16, 2026).

27. According to CBP, "border searches of electronic devices are often integral to determining an individual's intentions upon entry to the United States and thus provide additional information relevant to admissibility of foreign nationals under U.S. Immigration law." *Id.*

28. CBP claims that such searches are rare and "exercised judiciously and responsibility" so as to be "consistent with the public trust." *Id.*

29. In its internal directive, effective January 1, 2026, CBP echoes those policies and justifications, stating that officers may search electronic devices at border crossings under federal statutes and Supreme Court precedent. *See Border Search of Electronic Devices* ("CBP Directive"), U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION (Jan. 1, 2026), https://shorturl.at/rYt02 (last visited Aug. 16, 2026).

30. The Directive differentiates between basic and advanced searches of electronic devices. *Id.* at 3.3-3.4. An advanced search is one in which an officer connects a device to equipment to analyze the contents. *Id.* at 3.4 According to the Directive, use of external

equipment to make the devices available for inspection does not constitute an advanced search. *Id.*

31. According to the Directive, officers may conduct basic searches without suspicion, but advanced searches require reasonable suspicion of activity in violation of laws enforced or administered by CBP, or without individualized reasonable suspicion, when there is a national security concern. *Id.* at 5.1.4.

32. All searches of electronic devices are to be documented in appropriate CBP systems; when an advanced search is conducted, the justification for that search is also to be documented. *Id.* at 5.1.5.

## III. Plaintiff's Trip to Iran in 2026

33. Prior to his July 2026 trip, Plaintiff had once traveled to Iran in May 2025, to participate in a public media festival, report on US-Iranian negotiations, and produce a documentary on Iran's Jewish community.

34. His return trip was uneventful; he was not subjected to any kind of search, nor did CBP officers ask to search his phones, attempt to search his phones, or seize his phones.

35. On July 3, 2026, Plaintiff embarked on a 6-day trip to Iran to report on the funeral of Ayatollah Ali Khamenei, which has been described as the largest funeral in recorded history.

36. Plaintiff entered Iran exactly as American reporters working for establishment media outlets such as CNN and NBC did—on a press visa granted by the Iranian Foreign Ministry. While in Tehran, he participated in official press events alongside American reporters for CNN and NBC, who were also in the country to cover the funeral.

37. To Plaintiff's knowledge, no other American reporter was subjected to interrogation or had their devices seized by CBP agents upon their return to the United States.

38. Upon information and belief, it is probable that had another journalist been treated this way, he or she would have publicized it, since it is highly unusual and (as discussed throughout this complaint) raises constitutional concerns.

39. While in Iran, Plaintiff interviewed members of the country's negotiation team, top political officials, academics, prominent journalists, and average citizens for a series of video and print reports for *The Grayzone*.

40. Additionally, Plaintiff visited various sites that the United States and Israel had bombed during the current war, including Gandhi Hospital, an entire neighborhood in Eastern Tehran, Azadi Football Stadium and Rafi-Nia Synagogue.

41. Plaintiff intended to use the information, photographs and videos he gathered during that trip to write news articles and produce news videos in the course of his employment as a journalist.

42. Plaintiff departed Tehran, Iran, on July 10, 2026, flying through Istanbul, Turkey, on the way to Dulles International Airport in Virginia, with one checked suit-case, one carry-on backpack, and another carry-on containing two Persian rugs.

43. Plaintiff noticed that his boarding pass for the flight from Istanbul to Dulles International Airport was marked with the letters "SSSS," which he understood to mean that he had been flagged by the DHS for a secondary screening upon reentry into the United States.

44. Plaintiff arrived at Dulles International Airport at approximately 8:00 p.m. on July 10, 2026.

45. After passing through CBP's biometric screening, Plaintiff approached the passport desk where a CBP officer took his passport and placed it in a red box. Plaintiff understood that

meant he was not free to proceed. Another CBP officer then approached Plaintiff and directed him to a secondary screening room.

46. Plaintiff waited approximately 20 to 30 minutes until another CBP officer appeared and spoke with him at a metal desk. A total of two CBP officers engaged in questioning Plaintiff during this secondary screening.

47. The CBP officer searched Plaintiff's carry-on bags, which contained a laptop computer and digital camera. They asked him questions about his identity and his work as a journalist.

48. The officers then asked another series of questions whether he was financially compensated for the interviews he conducted there, and how he paid for his travel.

49. The CBP officer then asked Plaintiff whether he had plans to return to Iran soon and Plaintiff replied that he did not. After about 10 minutes of questioning, CBP officers escorted Plaintiff to the baggage carousel so that he could retrieve his luggage.

50. Plaintiff identified his luggage and carried it back to the secondary screening area. The CBP officers began searching Plaintiff's checked bags and demanded that Plaintiff surrender his electronic devices to them.

51. Plaintiff cooperated and turned over two mobile phones that he had on his person: a Google Pixel 6 and a Google Pixel 8. CBP officers did not ask for, open, or take Plaintiff's laptop computer or digital camera.

52. When Plaintiff placed his two mobile phones on the table in front of the CBP officers, they said they were required to search his devices for evidence of criminal activity or child sexual material. They then instructed him to unlock the smartphones, asking for

Plaintiff's passcodes. Plaintiff declined to provide the passcodes as he believed this an unreasonable privacy intrusion, particularly given his work as a journalist.

53. The CBP officers responded that in that case, they would detain the phones. One of the officers told Plaintiff that they were going to "hook them up to machines" in order to extract data from them, which would take one day or so.

54. CBP officers asked Plaintiff if his phones contained communications with his attorney. Plaintiff did not understand the implication and did not respond.

55. Plaintiff was detained by CBP for a total of approximately 2 hours, after which officers returned his passport at approximately 10:30 p.m. He was permitted to take his luggage, including the laptop computer and digital camera.

56. CBP officers provided Plaintiff with a telephone number to call about the status of the phones. Plaintiff left Dulles at approximately 10:30 p.m., exhausted after a long day's travel and the stress of being subjected to unwarranted questioning by CBP.

## IV. Social Media Posts of Online Influencers Targeting Plaintiff

57. Laura Loomer, who considers herself a journalist and is a social media influencer with 1.9 million followers on the social media platform X, is a close associate of President Trump's. He has met with her on several occasions, including in the Oval Office. The President openly admits to taking advice from her. Josh Meyer, *Conspiracy theorist Laura Loomer hints at more Trump firings on her claims of* 'disloyalty', USA Today (Apr. 4, 2025), https://shorturl.at/gJPjU (last visited Aug. 7, 2026).

58. Ms. Loomer's influence over the President and her ability to achieve critical policy and personnel decisions appears to be significant. For example, in April of 2025, President Trump fired six National Security Council (NSC) officials and two top National Security

Agency (NSA) leaders after Ms. Loomer targeted them. *See* Maggie Haberman, Jonathan Swan, and Ken Besinger, *Trump Fires 6 N.S.C. Officials After Oval Office Meeting with Laura Loomer*, THE NEW YORK TIMES, (Apr. 3, 2025) https://shorturl.at/t1bcf (last visited Aug. 7, 2026).

59. In August of last year, shortly after a social media campaign by Ms. Loomer to deny humanitarian visas to children from Gaza in desperate need of medical care, in which she tagged Secretary Rubio repeatedly, the US State Department announced that it would stop issuing such visas. Ms. Loomer took credit, calling the move "fantastic news" and stating that "Hopefully all GAZANS will be added to President Trump's travel ban." *See* Robert Mackey, *US state department stops issuing visas for Gaza's children to get medical care after far-right campaign*, THE GUARDIAN (Aug. 16, 2025), https://www.theguardian.com/us-news/2025/aug/16/gaza-children-visas-medical-care-laura-loomer (last visited Aug. 7, 2026).

60. Nate Swanson, a representative and top Iran expert on President Trump's Iran negotiating team from the National Security Council, was fired this past March after Ms. Loomer tweeted critically about him. Ms. Loomer was widely credited with effectuating his ouster. *See* Scott Waldman, Ben Johansen, and Sophia Cai, *He just chose not to listen*, POLITICO (Mar. 27, 2026), https://shorturl.at/K8ZXQ (last visited Aug. 7, 2026).

61. On July 5, 2026, during Plaintiff's trip to Iran, Ms. Loomer, wrote a long post on X denouncing him and, among other things, calling for Defendant to have him "taken off the plane by US Marshalls when he lands back in the US … detained" and his passport revoked. She also declared that Plaintiff's "bank accounts should be flagged by FINCEN as well to make sure [he] isn't being paid by sanctioned Iranian officials in violation of US law and FARA," and tagged Secretary Rubio, DHS's official account, and FBI Director Kash Patel at the bottom

of the post. *See* Laura Loomer (@LauraLoomer), X (Jul. 5, 2026, at 8:57 PM), https://x.com/LauraLoomer/status/2073934330158886922 (last visited Aug. 13, 2026).

> **Laura Loomer** @LauraLoomer · Jul 5
>
> NEW:
>
> 🚨 Radical leftist Max Blumenthal is currently in Iran participating in the funeral of Iran's former Supreme Leader Ayatollah Khamenei with IRGC supporters and jihadists who are calling for "Death to America" and for President Trump to be assassinated. 🚨
>
> Just a reminder that Joe Kent @joekent16jan19, who was the Director of the National Counterterrorism Center under the current Trump administration until he "resigned", is married to Heather Kaiser @HeatherKaiserWA, who works for Max Blumenthal and writes for his publication @TheGrayzoneNews.
>
> @MaxBlumenthal has previously said he has a source at ODNI whom he's referred to when he's broken stories about Iran, Israel and Venezuela. Kent worked under Tulsi Gabbard at @ODNIgov, where he once served as her Chief of Staff, while his wife was writing for one of the biggest Trump haters, Islamic sympathizers and Jew haters in media, Max Blumenthal.
>
> When you understand this dynamic, it's not hard to figure out who Blumenthal's source was/is...
>
> There is a reason why Joe Kent is currently under @FBI investigation for allegedly leaking classified information.
>
> The lack of vetting in the Trump administration is astounding. The fact that Joe Kent was allowed to work under ODNI as the now Director's @DNIGabbard Chief of Staff, and also as the Director of the National Counterterrorism Center while his new wife was/is working for a man who is now in Iran parading around with IRGC supporters is just insane.
>
> If DHS Secretary @SecMullinDHS Markwayne Mullin is worth anything, he will have Max Blumenthal taken off the plane by US Marshalls when he lands back in the US, he will have Max detained, and will revoke his passport.
>
> Max Blumenthal's bank accounts should be flagged by FINCEN as well to make sure Max isn't being paid by sanctioned Iranian officials in violation of US law and FARA.

62. Ms. Loomer wrote a similar X post on July 7, in which she stated, *inter alia*, that she "hoped [Plaintiff would be] raided in a heavily armed raid by the @FBI at 5am and that @SecRubio strips you of your passport for aiding the Iranian regime as they chant Death to America. I hope @SecScottBessent investigates how you paid for your trip to Iran, or if it was given to you by Iran and IRGC supporters so you are charged and prosecuted for possible sanctions violations." *See* Laura Loomer (@LauraLoomer), X (Jul. 7, 2026, at 5:03 PM) https://x.com/LauraLoomer/status/2074600105060036620 (last visited Aug. 13, 2026).



Laura Loomer
@LauraLoomer
Replying to @MaxBlumenthal

I went to India to speak at a conference for @IndiaToday where I blasted Islam and spoke about what a death cult it is.

Khamenei *was* a Muslim who defended child rape, along with Ayatollah Ruhollah Khomeini. What are you even talking about you rat faced communist traitor?

The passage below comes from Ayatollah Khomeini's official Islamic law manual, Tahrir al-Wasilah on Nikah.

In the passage, Khomeini outlines rulings that permit sex with minors and sets the legal framework that allowed for marriage of girls as young as nine years old in Iran after the 1979 Islamic Revolution in Iran.

Khomeini, like most Muslim men and the fake prophet Mohammed, was a pedophile who justified raping 9 year old girls. Khamenei fully supported these teachings because he was also likely a pedophile.

Ayatollah Ali Khamenei was a staunch supporter of Ayatollah Ruhollah Khomeini. He was an ardent advocate for Khomeini's Islamic Revolution and helped organize its new military structures. Because of his loyalty, Khomeini appointed him to key leadership roles and backed him to become Iran's president in 1981.

@MaxBlumenthal, You're a shill for Islam and communism and I hope you're raided in a heavily armed raid by the @FBI at 5 am and that @SecRubio strips you of your passport for aiding the Iranian regime as they chant Death to America.

I hope @SecScottBessent investigates how you paid for your trip to Iran, or if it was given to you by Iran and IRGC supporters so you are charged and prosecuted for possible sanctions violations.

63. Elon Musk is also known to have a close relationship with the President. Mr. Musk and his company, SpaceX, spent more than $276 million to help re-elect Donald Trump in 2024. *See Top Contributors, federal election data for Donald Trump, 2024 election cycle*, OPEN SECRETS, https://www.opensecrets.org/2024-presidential-race/donald-trump/contributors?id=N00023864 (last visited Aug. 7, 2026).

64. Mr. Musk suggested the creation of a new agency, the Department of Government Efficiency (DOGE). Upon his reelection, Mr. Trump created DOGE and appointed Mr. Musk to run it, which he did in early 2025. *See* Jonathan J. Cooper, *Trump says he'd create a government efficiency commission led by Elon Musk*, AP NEWS (Sept. 5, 2024), https://shorturl.at/evCgf (last visited Aug. 16, 2026).

65. On July 7, 2026, Mr. Musk, commented "WOW" on a post accusing Plaintiff and three others of dedicating their lives to advocating for Antifa, Palestine, Russia, and the Islamic Republic of Iran.

66. Since Mr. Musk is the owner of X and by far its largest account holder with 241 million followers, his one-word comment was amplified, causing the original post to reach more than 500,000 viewers within hours.




67. On July 14, 2026, after CBP seized Plaintiff's phones, Ms. Loomer stated that she could not "wait for [Plaintiff] to go to prison" and "the FBI is already on that, from what I heard." *See* Laura Loomer (@LauraLoomer), X (Jul. 14, 2026, at 5:24 PM), https://x.com/LauraLoomer/status/2077142253831594216?s=20 (last visited Aug. 13, 2026).



68. On July 22, Ms. Loomer reposted an X post by "Insurrection Barbie" about Plaintiff, accusing him of being a foreign agent, stating "Yah, have some self awareness @MaxBlumenthal. I am dropping a big story about you." *See* @LauraLoomer, X (Jul. 22, 2026, at 5:59 PM), https://x.com/LauraLoomer/status/2080050129344647486?s=20 (last visited Aug. 13, 2026).




69. On July 30, 2026, Ms. Loomer posted on X a letter from several congresspeople, requesting that the Justice and State Departments investigate several Americans who attended the Ayatollah's funeral. Though she didn't initially list Plaintiff, later in the post she wrote: "MAX BLUMENTHAL! @MaxBlumenthal. I'll personally be contacting each of the Congressional signatories of this letter to request they send another letter to @StateDept, DOJ, and @FBI that specifically mentions Blumenthal and his publication @TheGrayzoneNews. Max Blumenthal belongs in prison. His day is coming. Mark my word. I have some very damning documents in my possession pertaining to Blumenthal. I will be sharing them with the FBI and all of the members of Congress who signed this letter." *See* Laura Loomer

(@LauraLoomer), X (Jul. 30, 2026, 7:54 AM), https://x.com/LauraLoomer/status/2082797055672492320) (last visited Aug. 13, 2026).

**Laura Loomer**
@LauraLoomer
Subscribe

6 members of Congress have written a letter to @SecRubio and @DAGToddBlanche for the purpose of asking the US State Department @StateDept and DOJ to investigate several Amercians who attended the funeral of the Ayatollah in Iran, including: @jacksonhinkle, @ChrisHelali, and @CallaWalsh, who used to work for Senator Elizabeth Warren @SenWarren before she moved to the Middle East to be a spokesperson for Islamic terrorists.

The letter says,

"This type of behavior is wholly and entirely un-American. In fact, the only thing American about these people are their passports. They are traitors and terrorists that must be held accountable.
They are a subversive and destabilizing force acting on behalf of a hostile foreign power in open hostilities with the United States. If they loath our great nation so much, we should do them, as well as all real Americans, a favor and deny them re-entry into the United States of America.

Calling ourselves Americans means more than waiving around a U.S. passport. Support for the enemies of our country, with American blood on their hands, must be a disqualifying offense.
We undersigned ask that you investigate these individuals" attendance of Ali Khamenei's funeral and their participation in its IRGC coordinated programing to assess whether it qualifies as material support for a Foreign Terrorist Organization under the Violent Crime Control and Law Enforcement Act of 1994(18 U.S.C. § 2339A) or the Antiterrorism and Effective Death Penalty Act of 1996 (18 U.S.C. 2339B)."

The letter forgot to mention another American who attended the Ayatollah's funeral where organizers and attendees were chanting "Death to America" and "Kill Trump".

MAX BLUMENTHAL! @MaxBlumenthal

I'll be personally contacting each of the Congressional signatories of this letter to request they send another letter to @StateDept, DOJ, and @FBI that specifically mentions Blumenthal and his publication @TheGrayzoneNews.

Max Blumenthal belongs in prison. His day is coming. Mark my word. I have some very damning documents in my possession pertaining to Blumenthal. I will be sharing them with the FBI and all of the members of Congress who signed this letter.

Cc: @RepKeithSelf @RepFine @claudiatenney @derrickvanorden @RepMaxMiller @TXRandy14

70. Later that day, another ally of President Trump, Ohio Congressman Max Miller (who has been the subject of allegations of abusive domestic behavior in recent weeks) quote-tweeted the abovementioned post and wrote "@maxblumenthal also traveled to Iran. I understand his comms was intercepted when he came back." *See* Congressman Max Miller (@RepMaxMiller), X (Jul. 30, 2026, at 10:15 AM), https://x.com/RepMaxMiller/status/2082832517963436450 (last visited Aug. 13, 2026).


Congressman Max Miller
@RepMaxMiller

@maxblumenthal also traveled to Iran. I understand his comms was intercepted when he came back.

Laura Loomer @LauraLoomer · Jul 30
6 members of Congress have written a letter to @SecRubio and @DAGToddBlanche for the purpose of asking the US State Department @StateDept and DOJ to investigate several Amercians who attended the funeral of the Ayatollah in Iran, including: @jacksonhinkle, @ChrisHelali, and x.com/lauraloomer/st...

71. On August 1, 2026, former congresswoman Marjorie Taylor Greene, along with several other well-known conservative anti-war figures, including Tucker Carlson, Joe Kent, and Thomas Massie, posted a tweet with the remark: “We said no more foreign wars and we meant it and supported Donald Trump because he made that promise. But he’s betrayed us all. Our commitment is America First for all Americans, right, left, and center. The movement has begun.”

72. Ms. Loomer quote-posted the post with her own commentary: “Marjorie Traitor Greene announces a new movement has begun with her, her husband Brian Glenn, Tucker Qatarlson, Thomas Massie, his wife he married immediately after his wife of 30 years died, Joe Kent and Joe Kent’s wife who works for radical left operative Max Blumenthal whose electronics were just seized by the Trump DHS after he returned from Iran where he attended the Ayatollah’s funeral where attendees were chanting ‘death to America’ and ‘kill Trump.’ Every single one of these people belongs on a government watch list. Every person in this

photo is a traitor to America and an anti-Trump operative amplified by foreign adversaries." *See* Laura Loomer (@LauraLoomer), X (Aug. 1, 2026 at 11:38 AM), https://x.com/LauraLoomer/status/2083578233874756004 (last visited Aug. 13, 2026).




73. On August 2, 2026, Loomer posted yet another quote targeting Plaintiff, stating that his "electronics were just confiscated by DHS upon his return from Iran where he attended the Ayatollah's funeral and praised attendees." *See* Laura Loomer (@LauraLoomer), X (Aug. 2, 2026 at 9:39 AM), https://x.com/LauraLoomer/status/2083910544478679053 (last visited Aug. 13, 2026).

Laura Loomer
@LauraLoomer
Subscribe

Well, because of the amazing vetting, somehow, the Director of the National Counter Terrorism Center in the United States under the second Trump administration (Joe Kent) was able to get his job under @TulsiGabbard at DNI despite the fact that he is married to an employee of radical leftist Max Blumenthal @MaxBlumenthal, whose electronics were just confiscated by DHS upon his return from Iran where he attended the Ayatollah's funeral and praised attendees.

The attendees were all chanting "Death to America" and "Kill Trump".

Muslim terrorists murdered Joe Kent's first wife but he is so incredibly unstable, he now blames the Jews for blowing his wife up. The last words Shannon Kent heard before she was incinerated by Mohammed was "Allahu Akbar", but Joe Kent wants to blame Shlomo and Bibi.

But, we were all told we needed to support "coalition building" and "trust the Democrats being brought into the Trump administration".

How did that work out?

Now, Max Blumenthal, who is the son of Clinton operative Sidney Blumenthal, is suing the Trump administration to avoid being held accountable for glorifying Islamic terrorism in Iran during a time of war.

Also, since the second Trump administration began, absolutely nothing has been done domestically to combat the spread of Islamic terrorism in America because @joekent16jan19 Joe Kent, the Director of the National Counterterrorism Center, who resigned before it was announced that he is under FBI investigation for allegedly leaking classified information,

← Post

So as a result, Jews are now being targeted and hunted down in America while Islamic terrorists are literally getting elected to the United States Congress and leading America's largest cities.

Vetting matters!

The Guardian
News | Opinion | Sport | Culture | Lifestyle
US news | US politics | Midterms 2026 | World | Climate crisis



Trump administration
US reporter fighting back after border patrol seized his cellphones
Max Blumenthal says he was singled out at airport after Trump ally Laura Loomer targeted him in online posts

Mike Reininger @MikeReininger12 · Aug 2
Replying to @LauraLoomer
I didn't know about Joe Kent's wife. That's a story that needs amplifying.

9:39 AM · Aug 2, 2026 · 93.3K Views

74. That evening, Ms. Loomer boasted of her targeting Mr. Blumenthal to U.S. authorities and took credit for the confiscation of Plaintiff's phones, posting on X that he was "crying over the fact I reported him to the authorities when he traveled abroad to Iran to attend the Ayatollah's funeral and then DHS confiscated two of his cell phones when he returned from

Iran." *See* Laura Loomer (@LauraLoomer), X (Aug. 2, 2026, at 9:42 PM), https://x.com/LauraLoomer/status/2084092504106742126 (last visited Aug. 13, 2026).



Laura Loomer @LauraLoomer · Aug 2
Waaaaaaaa Waaaaaaaa 😭😭😭 somebody call the Wambulance!!!!

Radical leftist and Islamic terrorist sympathizer Max Blumenthal @MaxBlumenthal is crying over the fact that I reported him to the authorities when he traveled abroad to Iran to attend the Ayatollah's funeral and then DHS confiscated two of his cell phones when he returned from Iran.

Max allegedly refused to tell Border Patrol who paid for his trip to Iran, a sanctioned country currently at war with the United States, and he allegedly refused to comply with Border Patrol's questioning, most likely because telling them the truth about what he was really doing in Iran would likely land Max in serious trouble with law enforcement.

We don't need to use our imagination to imagine what Max was doing in Iran.

If you are supporting enemies of America and may possibly even be violating sanctions, I will monitor you and report you to federal law enforcement. And no, I won't apologize for doing so either, no matter how much you throw a tantrum and cry about it.

When you play stupid games, you will win stupid prizes.

theguardian.com/us-news/2026/a...

75. On August 3, 2026, Ms. Loomer—tagging DHS's official account, FBI Director Kash Patel, the State Department, Secretary Rubio, and Secretary Bessent—again accused Plaintiff of being an "anti-American propagandist" and called "for law enforcement to raid Blumenthal and hold him and @TheGrayzoneNews accountable once and for all. His passport should be confiscated and he should be thoroughly investigated." *See* Laura Loomer (@LauraLoomer), X (Aug. 3, 2026 at 6:56 AM), https://x.com/LauraLoomer/status/2084231826281832856 (Aug. 13, 2026).


Laura Loomer @LauraLoomer · Aug 3
‼️ ATTENTION @DHSgov @FBIDirectorKash @SecScottBessent @StateDept ‼️

In addition to traveling to Iran attend the funeral of the Aystollah where attendees were chanting "Death to America" and "Kill Trump", radical leftist and Islamic sympathizer Max Blumenthal @MaxBlumenthal sat down for an "interview" with the head of @ExplosiveMediaa Explosive Media, the creator of the Iranian LEGO propaganda videos that openly call for the assassination of President Trump, US citizens and Trump administration officials, including myself.

The men who operate Explosive Media are affiliated with Iran's Media Literacy Club, an Islamic Regime media training pipeline, as well as Islamic Republic of Iran Broadcasting (IRIB), Iran's state broadcaster which has been sanctioned for cooperating with the IRGC.

The LEGO videos are part of Iranian state media. Blumenthal is seen in the video below sitting in front of the flag of the Islamic Republic of Iran.

Explosive Media usually begins or ends their LEGO videos with a giant red sign that says "KT". KT means "Kill Trump".

This interview comes after Blumenthal's electronics were seized by DHS and Border Patrol upon his return to the United States from Iran, where he was questioned by authorities over who paid for his trip and what he was doing in Iran.
Blumenthal was reportedly very combative with authorities, elusive over who paid for his trip, and he is now suing the Trump administration to prevent the evidence from coming out. He really doesn't want authorities seeing the alleged communications on his phone with Iranian officials and whoever else it is that he met with while he was in Iran… likely because it could possibly lead to criminal charges.

Blumenthal is NOT a journalist. He is an anti-American propagandist who is amplifying content creators who are explicitly calling for the assassination of President Trump and who are directly tied to sanctioned entities.

It's time for law enforcement to raid Blumenthal and hold him and @TheGrayzoneNews accountable once and for all. His passport should be confiscated and he should be throughly investigated.

@SecRubio @FBIDirectorKash



76. Ms. Loomer continues to post daily about Plaintiff, openly demanding his imprisonment. On August 4, 2026, she wrote: "[a]ll I care about when it comes to you is a political scalp and accountability with the law. You are subhuman to me. I look at you as a piece of political taxidermy that I can put on my wall. That's it." Laura Loomer (@LauraLoomer), X (Aug. 4, 2026 at 4:17 PM), https://x.com/lauraloomer/status/2084735555863265723?s=46 (last visited Aug. 13, 2026).

> **Laura Loomer** @LauraLoomer
> Subscribe
>
> Max, reporting on your continued treasonous behavior isn't a mental breakdown.
>
> I'm not bothered by any of your insults.
>
> You and I both know you did more than just "interview" the creators of the Lego videos that openly call for the assassination of President Trump.
>
> You are approvingly promoting them.
>
> What does your Daddy Sidney think about the lunatic he raised as a son? Is it true he tells his friends in Democrat circles that your only redeeming quality is that you gave him one grand child?
>
> That's what your daddy's friends told me.
>
> I'm glad I have you nervous. I don't care if you call me crazy, call me ugly, mock my appearance or put me down.
>
> All I care about when it comes to you is a political scalp and accountability with the law.
>
> You are subhuman to me. I look at you as a piece of political taxidermy that I can put on my wall. That's it.
>
> It's not personal.
>
> > **Max Blumenthal** @MaxBlumenthal · Aug 4
> > My journalistic output seems to have triggered yet another mental breakdown by Laura Loomer.
>
> ← **Post**
>
> 4:17 PM · Aug 4, 2026 · **86K** Views

## V. RULE 41(G) MOTION SYNOPSIS

77. On July 14, 2026, Plaintiff called the phone number provided by the CBP officers who seized his smartphones and was connected to an automated answering service directing him to send an email to check on the status of seized devices.

78. Plaintiff was not comfortable contacting CBP electronically due to his concerns that it might expose him to further risk of unlawful surveillance or seizure by compromising his cloud accounts and so declined to follow that procedure.

79. On July 16, 2026, Plaintiff filed a Fed. R. Crim P. 41(g) motion against Defendant Mullin through undersigned counsel, requesting the return of his phones and all information obtained therefrom. *See Blumenthal v. Mullin*, No. 1:26-m-00016, Dkt. 1 (E.D. Va. Filed July 16, 2026).

80. The following day, a CBP employee left him a voicemail indicating that he could pick up his seized electronic devices from Dulles International Airport, which he did later that evening.

81. Plaintiff spoke with the CBP agent and asked if the devices had been copied, or if any spyware had been placed on the phones. The CBP agent laughed and said no.

82. On July 27, Defendant Mullin submitted a written opposition to Plaintiff's Rule 41(g) motion. He did not contest the legal framework, but maintained that because Plaintiff's phones had been returned, the matter was moot, especially since a Chief CBP officer submitted a declaration stating that though agents tried, they were unable to obtain data from Plaintiff's phones. *See Blumenthal v. Mullin*, No. 1:26-m-00016, Dkt. 13-1 (Exhibit A) (E.D. Va. July 27, 2026).

83. Plaintiff filed a reply the following day arguing that the declaration contained a paucity of information with respect to who had come into contact with the phones and exactly what procedures or attempted procedures had been performed to obtain data, so he had inadequate assurance the government had not, in fact, unlawfully obtained material from his phone in violation of his constitutional and statutory rights or was not continuing to obtain data from tech companies or the cloud that would allow them to retrieve private information. *See Blumenthal v. Mullin*, No. 1:26-m-00016, Dkt. 15 (E.D. Va. Filed July 28, 2026).

84. On July 29, the district court in the Eastern District of Virginia held a hearing on Plaintiff's Fed. R. Crim. P. 41(g) motion.

85. Judge Leonie Brinkema stated that she was "concern[ed]" because the government conceded that it held Plaintiff's phone to conduct an advanced search, while "the Fourth Circuit has quite clearly drawn the line between a routine search of a cell phone at the border and a

more intense or advanced search. . . now under Fourth Circuit case law, a search warrant would be required for that degree of intrusion into a cell phone." Transcript of 7/29/26 Hearing at 2-3, *Blumenthal v. Mullin*, No. 1:26-cv-16 (2026).

86. The court added that "given the fact that this plaintiff is a reporter, this case has particular concern to the Court because there's been so much recently in the ether about attempts by the government to intrude upon a reporter's right to report…just recently in New York we had the issue of the subpoenas that were issued to the New York Times reporters. I don't think that can be overlooked in this context." *Id.* 5.

87. The court held that the defense declaration provided insufficient assurance that the government had not in fact obtained any data from the phones, identifying three specific defects: the basis of the declarant's knowledge was not explicated; no information was provided about the individual or individuals who handled the phones; and the declaration did not describe the nature and extent of attempts to obtain data from the phones. *Id.* 5, 8.

88. Because this information was lacking, the court stated that limited discovery was warranted. The government agreed to produce a more detailed declaration by August 12, 2026, to which Plaintiff would have the opportunity to respond by August 19. *Id.* at 7-8.

89. On August 12, 2026, Defendant Mullin submitted a declaration from a DHS supervisory lead. *See* Supplemental Declaration of Damiel Mason, Dkt. 19-1, *Blumenthal v. Mullin*, No. 1:26-mc-16 (E.D. Va. Aug. 12, 2026).

90. According to the declarant, he is a Supervisory Lead for a DHS team of certified digital forensic analysis (DFAs). He was the supervisor of the DFA who received two phones from CBP via hand delivery, which belonged to Mr. Blumenthal. *Id.* ¶¶ 1-3, 5.

91. The declarant stated that Plaintiff's phones were connected to technology that DHS uses when attempting an advanced search. *Id.* ¶ 6. The declarant did not provide details regarding the credentials or training of the DFA who attempted the advanced search, how many such individuals were involved, where or when the advanced search was attempted, how long the attempted search lasted or how many attempts were made, how the phones were stored when they were not being searched, or whether anyone outside of declarant's department was permitted to examine or search Plaintiff's phones. Nor did he explain why CBP believed an advanced search was warranted—contrary even to the protocol in DHS's internal requirements. *See* CBP Directive 5.1.5.

92. According to the declarant, no information was extracted from the phones because the technology utilized was unable to retrieve the data. *Id.* ¶ 6. He further stated that no surveillance technology or computer code was installed on either of Plaintiff's phones, but no property logs or custody reports were included to corroborate that contention. *Id.* ¶ 7.

## VI. PLAINTIFF'S INJURIES STEMMING FROM THE GOVERNMENT'S UNLAWFUL ACTION

93. The timing and content of Ms. Loomer's public statements heighten Plaintiff's concern that he was and will be singled out for retaliatory treatment because of his constitutionally protected reporting and viewpoints, and that he will continue to be targeted by government actors when reentering the country and potentially in other contexts.

94. Plaintiff relies on maintaining source confidentiality to engage in his profession as a journalist.

95. Plaintiff is concerned that his confidential sources could be subjected to harm, including death, if their identities or locations are revealed, especially in Iran where the U.S. and Israel have assassinated numerous officials and media professionals in targeted strikes on

their places of work. *Israeli strike on Iranian state TV fills studio with dust and debris during live broadcast*, ASSOCIATED PRESS (June 16, 2025), https://apnews.com/article/iran-israel-irib-state-tv-air-strike-9ab46d05baeb354a6596bd09aa12a2d6 (last visited Aug. 12, 2026).

96. Plaintiff knows that the current Administration has issued subpoenas to journalists to identify their sources and threatened administration officials with prison time if they provide information to journalists about dwindling munitions supplies. *See* Ellie Cook, *Donald Trump Vows to Hunt Down 'Leakers' Saying US Running Out of Missiles*, NEWSWEEK (Aug. 6, 2026), https://www.nytimes.com/2026/08/01/us/politics/times-subpoena-reporter-trump-north-korea.html (last viewed Aug. 1, 2026).

97. Since CBP seized his electronic devices on July 10, Plaintiff has refrained from communicating with some sources because he fears excessive or unlawful government scrutiny of his communications.

98. For the reasons above, Plaintiff is fearful about being stopped and unlawfully searched again, and the damage such unlawful search and seizure would have on his work as a journalist.

99. Given that CBP disregarded his rights in conducting the search initially—despite clearly prevailing precedent from the Fourth Circuit—he has every reason to believe his rights will be violated again.

100. Since being subjected to CBP's unconstitutional search and seizure of his electronic devices, Plaintiff and his family have stopped planning a trip to Nicaragua where they were hoping to vacation later this year.

101. Plaintiff is concerned about accepting a pending invitation to speak in Netherlands at an event hosted by members of parliament this Fall because of the possibility that, absent a

court order, he will be subjected to further unconstitutional CBP searches and seizures upon reentry into the U.S.

## CLAIMS FOR RELIEF

### COUNT I: UNLAWFUL VIEWPOINT DISCRIMINATION AND RETALIATION (U.S. CONST. AMEND. I)

102. Plaintiff realleges the facts set forth above and incorporates those facts into this Count by reference.

103. The First Amendment, incorporated against the states through the Fourteenth Amendment, prohibits government from abridging the freedom of speech.

104. The Supreme Court has unequivocally interpreted that to forbid government officials within any branch from punishing or suppressing speech because of its message, ideas, subject matter, or viewpoint. *See Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'") (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)). *See also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

105. The Supreme Court has repeatedly held that viewpoint discrimination is an "egregious form of content discrimination" and "presumptively unconstitutional." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-830 (1995)).

106. Political speech is entitled to the highest degree of protection under the U.S. Constitution. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (explaining

that advocating a politically controversial viewpoint is "the essence of First Amendment expression.").

107. "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]'" *Sullivan*, 376 U.S. at 269 (quoting *Roth* v. *United States*, 354 U.S. 476, 484 (1957)). *See R. A. V. v. St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring in judgment) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech" in which "[c]ore political speech occupies the highest, most protected position[.]").

108. The Supreme Court has recognized that news reporters are "entitled to some constitutional protection of the confidentiality of [their] sources." *Pell v. Procunier*, 417 U.S. 817, 834 (1974) (citing *Branzburg v. Hayes*, 408 U.S. 665 (1972)). The Fourth Circuit has likewise explained that this protection is "necessary to ensure a free and vital press, without which an open and democratic society would be impossible to maintain." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000).

109. Government action that interferes with reporters' ability to gather and disseminate news, or that chills relationships between journalists and their confidential sources, raises substantial First Amendment concerns. *See Branzburg*, 408 U.S. at 707–08 ("Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification."); *Rossignol v. Voorhaar*, 316 F.3d 516, 521–22 (4th Cir. 2003) (holding that government officials' coordinated seizure of newspapers to suppress critical reporting violated "the most elemental tenets of First Amendment law" and constituted a prior restraint).

110. Government officials violate the First Amendment when they employ threats, intimidation, or other forms of informal coercion to suppress disfavored speech. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963) (recognizing that individuals "do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around[.]"). *See also NRA of Am. v. Vullo*, 602 U.S. 175, 198 (2024) ("The First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech[;]"); *id.* at 188 (A government official cannot "use the power of the State to punish or suppress disfavored expression.").

111. Given the facts alleged above, it appears Plaintiff was singled out for punishment because of his journalism and protected viewpoint by Defendants and Defendants' employees, officers, and agents.

112. No other journalists reported being subjected to the treatment to which Plaintiff was subjected, despite the fact many attended the same event in Iran.

113. Prominent individuals who are known to have influenced President Trump, Secretary Rubio, and others, baselessly accused Plaintiff of some form of criminal disloyalty to the United States, and called for Plaintiff to be investigated and punished—after which he was subjected to a nonroutine border search and his smartphones were seized and a search at least attempted.

114. It is implausible that, had other journalists returning from Iran to report on the Ayatollah's funeral had their electronic devices seized, such information would not have been publicized, heightening the inference that the search resulted from targeted viewpoint-based discrimination.

115. Additionally, the fact that CBP officials had no interest in Plaintiff's digital camera or laptop suggests that the true purpose of the search was to retaliate against him for his constitutionally protected journalistic activity and identify his confidential sources. If CBP officials were concerned about illicit material or other criminal activity, those devices would have been the subject of a search as well.

116. The specific focus on Plaintiff's phones indicates they sought information about sources, contacts and other protected information.

117. Not only did Plaintiff suffer past injury in the form of a First Amendment violation, but his professional activities have been chilled as he fears future retaliation for his viewpoints and his journalistic activities.

118. Accordingly, Defendants violated Plaintiff's constitutionally protected First Amendment free speech rights, and Plaintiff reasonably fears that—in the absence of an injunction—Defendants, their officers, employees, and agents, will do so again in the future.

## COUNT II: UNREASONABLE SEARCH AND SEIZURE (U.S. CONST. AMEND IV)

119. Plaintiff realleges the facts set forth above and incorporates those facts into this Count by reference.

120. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects," and thereby prohibits the government from conducting "unreasonable searches and seizures," instructing that "no Warrants shall issue, but upon probable cause[.]"

121. The Supreme Court has long held that the "ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381 (2014).

122. In *Riley,* the Court recognized the heightened privacy interests in modern smartphones, which now contain even more personal information including contact lists, emails, text messages, photos, videos, location data, web browsing history, AI search histories, call logs and geolocation data. The Court reached the conclusion that in nearly all cases, a warrant is required for a search of a smartphone to be "reasonable" under the Fourth Amendment. *Id.*

123. While constitutional protections upon entry at U.S. Customs are substantially diminished when it comes to luggage in order to prevent contraband from entering the country and stave off national security threats, the circuit courts have been grappling with the question as to whether and to what extent CBP officers may search electronic devices without a warrant.

124. The current rule in the Fourth Circuit, formulated in *United States v. Cardozo*, 2026 U.S. App. LEXIS 20419 (4th Cir. Jul. 13, 2026), is that a *forensic* search of smartphones requires individualized suspicion of an offense that bears some nexus to the border search exception's purpose of protecting national security, collecting duties, blocking entry of unwanted persons, or disrupting efforts to export or import contraband. *See also Osama Abu Irshaid v. Mullin*, 1:24-cv-1405 (ED VA July 15, 2026) (following a bench trial, finding that government had violated Plaintiff's Fourth Amendment rights by subjecting his phone to a forensic search without a warrant or individualized suspicion).

125. The CBP agents here specifically stated that they intended to conduct a forensic search of Plaintiff's phones by hooking them up to machines to extract data. They did not have a warrant nor any individualized suspicion; they did not make any claim to the contrary in the context of the Rule 41(g) motion or at any other point.

126. The apparent targeting of Plaintiff because of his journalism and his viewpoints, and the distinct possibility that the purpose of the government's search was to identify Plaintiff's sources, exacerbates the unreasonableness of this search under the Fourth Amendment.

127. As Defendants admitted, they conducted or attempted to conduct a forensic search of his phones, despite the fact that the prevailing law in this Circuit prohibits such searches in the absence of a warrant or individualized suspicion. They failed to even follow their *own* directive and document the alleged justification for the search.

128. That demonstrates that absent an injunction, Plaintiff has no guarantee that Defendants will honor their commitment to uphold the Constitution and respect his rights.

129. Accordingly, Defendants not only violated Plaintiff's Fourth Amendment rights when CBP seized his phones and searched them, but Plaintiff reasonably fears that his right to be free from unreasonable government search and seizure will be violated in the near future should he exercise his right to travel internationally, which has led him to curtail his travel, including that needed for work.

**COUNT III: VIOLATION OF THE PRIVACY PROTECTION ACT (42 U.S.C. § 2000aa)**

130. Plaintiff re-alleges the facts set forth above, and incorporates them into this Count by reference.

131. Congress enacted the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, to provide heightened statutory protections against government searches and seizures of journalists' work product and documentary materials.

132. The PPA reflects Congress's recognition that indiscriminate government access to a journalist's unpublished materials threatens the free flow of information, chills confidential

sources, and undermines the First Amendment interests essential to a free press. S. Rep. No. 96-874, at 4–8 (1980), reprinted in 1980 U.S.C.C.A.N. 3950, 3950–54.

133. The PPA generally prohibits government officers and employees from searching for or seizing a person's "work product materials" or "documentary materials" possessed in connection with a purpose to disseminate information to the public through a newspaper, book, broadcast, or other similar form of public communication. 42 U.S.C. §§ 2000aa(a), (b).

134. "Work product materials" include those prepared or created in anticipation of communicating information to the public, including mental impressions, conclusions, opinions, and theories. 42 U.S.C. § 2000aa-7(b).

135. "Documentary materials" include photographs, recordings, notes, drafts, electronically stored information, and other materials upon which information is recorded. 42 U.S.C. § 2000aa-7(a).

136. Plaintiff's electronic devices plainly contain both categories of protected materials. During Plaintiff's recent professional trip to Iran, he likewise gathered interviews with senior Iranian officials, negotiators, academics, and civilians, together with extensive photographic and video documentation intended for future publication.

137. These materials were created and maintained for the purpose of communicating news and information to the public and therefore fall squarely within the protections afforded by the PPA.

138. Defendants' unreasonable search and seizure of Plaintiff's phones, which appeared to be based upon his profession as a journalist, the nature of the viewpoints he airs and espouses, and the possibility that his phones contain identifying source information, violated his rights under the PPA.

## COUNT IV: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (APA) (5 U.S.C. § 706)

139. Plaintiff realleges the facts set forth above, and incorporates them into this Count by reference.

140. CBP's January 2026 Directive permits officers to conduct basic searches of travelers' phones without any individualized suspicion, and advanced searches when they have a reasonable suspicion of activity in violation of laws enforced or administered by CBP, *or* when there is a national security concern, without any particularized suspicion.

141. The Directive's distinction between basic and advanced searches broadly mirrors the Fourth Circuit's distinction between manual searches requiring no individualized suspicion, and forensic searches which do require such suspicion, but is not identical insofar as CBP's directive permits the use of forensic technology to provide access to an otherwise inaccessible device.

142. The Directive constitutes "final agency action" since it has "direct and appreciable legal consequences"—as Plaintiff experienced. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)) (holding that final agency actions, which may be challenged in court, are policies "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'").

143. Unquestionably, the search of Plaintiff's phone constituted an advanced or forensic search, as the phones were hooked up to devices to extract data (Defendants have not, so far, claimed otherwise).

144. Courts in this Circuit require individualized suspicion for such searches; there is no national security exception.

145. Nor does the Fourth Circuit permit the use of forensic technology to provide access to an otherwise inaccessible device.

146. Thus, CBP's Directive therefore conflicts with the law of this Circuit, and had a direct and tangible impact upon Plaintiff, because his phones were searched as a result.

147. A court should hold unlawful agency action that constitutes an abuse of discretion and is contrary to a constitutional right. 5 U.S.C. § 706(2)(A), (B). Both circumstances are present here.

148. Enjoining the Directive is clearly necessary to preserve Plaintiff's rights, since CBP conducted a warrantless, suspicion-less search of his phones, causing a constitutional injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

A. A declaration that Defendant's seizure of Plaintiff's phones violated his First Amendment rights to be free from unlawful viewpoint discrimination and government retaliation;

B. A declaration that the same conduct violated his Fourth Amendment right to be free from unreasonable searches and seizures;

C. A declaration that the same conduct violated his rights as a journalist under the Privacy Protection Act;

D. A permanent injunction restraining and enjoining Defendants, as well as their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), from targeting him for punishment because of his journalistic practices and articulated viewpoints, as well as from seizing, searching, or attempting to seize or search Plaintiff's electronic devices upon entering or leaving the country, or anywhere else, in the absence of individualized suspicion or a warrant based upon probable cause;

E. A permanent injunction restraining and enjoining Defendants, as well as their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), from enforcing their January 1, 2026 Directive.

F. An award of reasonable attorneys' fees and costs to Plaintiff pursuant to the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504; 28 U.S.C. § 2412;

G. Such other and further relief as the Court deems just and proper.

Dated: August 17, 2026

Respectfully submitted,

/s/ George R.A. Doumar
George R.A. Doumar, Va. Bar No. 415446
Daniel R. Hernandez, Va. Bar No. 95384
DOUMAR MARTIN, PLLC
1530 Wilson Boulevard, Suite 1060
Arlington, Virginia 22209
Tel: (703) 243-3737
gdoumar@doumarmartin.com
dhernandez@doumarmartin.com

Jenin Younes (*pro hac vice forthcoming*)*
AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE
910 17th Street Northwest, Suite 400
Washington, DC 20006
Telephone: (202) 244-2990
jyounes@adc.org
**Designated Counsel for Service*

*Attorneys for Plaintiff*