**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| MAX BLUMENTHAL,<br><br>Plaintiff,<br><br>vs.<br><br>MARKWAYNE MULLIN, Secretary, Department of Homeland Security, *et al.*,<br><br>Defendants. | ) | Civil Action No. 1:26cv2629 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Pursuant to Local Rule 7(F)(1), defendants, through their undersigned counsel, hereby respectfully submit the instant memorandum of law in support of their motion to dismiss in the above-captioned action.

**INTRODUCTION**

In July 2026, upon his return from a trip to Iran, plaintiff Max Blumenthal was subjected to a border search by officers of U.S. Customs and Border Protection ("CBP"). As explained during prior litigation on that border search, *see Blumenthal v. Mullin*, No. 1:26mc14 (E.D. Va.), although CBP officers detained two of plaintiff's electronic devices – eschewing interest in his digital camera and laptop computer – and attempted a forensic search of those two devices, that attempt was unsuccessful, and the Government never conducted any search (forensic or otherwise) on the devices. But plaintiff has now instituted this follow-on civil action, seeking broad-ranging equitable relief in the form of declaratory judgments and injunctions that primarily would preclude federal officials from subjecting plaintiff to another border search in the absence of the constitutional and statutory requirements for the same.

These claims fail at the threshold. As this Court is well aware, it is plaintiff's burden to establish the justiciability of his claims, including that he has Article III standing to proceed. And with respect to claims for forward-looking relief, plaintiff cannot simply rely on his allegation that he was subjected to a *past* unlawful border search to dispatch this significant burden; rather, it is well-settled that he must demonstrate that it is *likely* that he will be subjected to an unlawful border search in the imminent future. This he cannot do. Although he primarily relies on posts by an individual that he calls a "social media influencer" to demonstrate how CBP officers are likely to act in the future, many aspects of those posts – even assuming that he can rely on a non-government actor's statements to vest this Court with constitutional jurisdiction – actually render a future border search in the absence of some heretofore unknown individualized suspicion unlikely. Because this standing problem applies to each of plaintiff's claims, this Court should dismiss the instant complaint in its entirety for lack of subject-matter jurisdiction pursuant to Federal Rule 12(b)(1).

Certain of plaintiff's claims also do not state a plausible claim for relief. Plaintiff's complaint, for instance, does not contain non-conclusory factual allegations sufficient to render plausible the conclusion that CBP's decision to conduct a border search upon plaintiff's return from Iran was motivated by animus towards plaintiff's reporting. As plaintiff ably recounts in his complaint, rather than search through all of plaintiff's electronic devices in an effort to find any possible evidence of criminal conduct on plaintiff's part – as one fueled by First Amendment animus presumably would do – CBP's border search was far more targeted. Plaintiff's nuanced challenge to a portion of CBP's most recent Directive on border searches of electronic devices as inconsistent with Fourth Circuit authority fails both because the Directive expressly instructs CBP officers to follow the very decisional authority that plaintiff identifies and because the Fourth

Circuit has unequivocally held that federal law enforcement officers may conduct a forensic search of electronic devices – which can reach materials that are both password-protected and about which the owner was unaware – simply upon individualized suspicion.

For these reasons, this Court should dismiss plaintiff's complaint pursuant to Federal Rule 12(b)(1) or (b)(6).

## BACKGROUND

At its core, the instant action concerns the conduct of so-called "border searches"; *i.e.*, searches and/or seizures conducted by federal law enforcement personnel at the international border or its functional equivalent, such as an airport. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973). As such, to assist in framing the threshold jurisdictional arguments asserted here, this memorandum will first explain the parameters of those types of law enforcement activities before discussing the particular factual allegations found in plaintiff's complaint.

### I. BORDER SEARCHES

#### A. GENERALLY

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Generally, this requires that a law enforcement officer "obtain a warrant, supported by probable cause, to search or seize someone's person or property." *United States v. Nkongho*, 107 F.4th 373, 380 (4th Cir.), *cert. denied*, 145 S. Ct. 776 (2024). But searches and/or seizures at the borders of the United States represent an exception to this general rule – and *do not* require issuance of a warrant upon a showing of probable cause. *See United States v. Ickes*, 393 F.3d 501, 505 (4th Cir. 2005) ("[S]ince the birth of our country, customs officials have wielded broad authority to search the belongings of would-be entrants without obtaining a warrant and without

establishing probable cause."); *see also United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (noting the "impressive historical pedigree" of border searches) (quoting *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 (1983)). Pursuant to this "border exception," courts have differentiated between so-called "routine" and "non-routine" searches in identifying the circumstances, short of a warrant issued upon a demonstration of probable cause, that would authorize the search and/or seizure of an individual's belongings. *See United States v. Belmonte Cardozo*, 181 F.4th 461, 467-68 (4th Cir. 2026). At bottom, the Fourth Circuit has recognized that "[r]outine border searches are reasonable without individualized suspicion, but nonroutine searches are reasonable only when justified based on some level of individualized suspicion." *Id.* at 467; *see also United States v. Kolsuz*, 890 F.3d 133, 138 (4th Cir. 2018) ("Non[-]routine searches are permitted under the border exception, so long as they are accompanied by the appropriate level of individualized suspicion.").[1]

But this begs the question of what differentiates a "routine" border search from one that is "non-routine." The Fourth Circuit analyzed this question a few months ago, ultimately holding that when federal law enforcement officers seek to conduct a forensic search of electronic devices, a "non-routine" border search occurs. *See Belmonte Cardozo*, 181 F.4th at 468-72; *see also Kolsuz*, 890 F.3d at 146. And this is because "[i]n a forensic search, an officer connects the device to outside hardware and software, *copies the contents and analyzes the copy*." *Belmonte Cardozo*, 181 F.4th at 471 (emphasis added). That type of search "sweeps the whole device," "recovers . . . deleted files, cached fragments, location histories, system logs and metadata the owner never

[1] And the individualized suspicion "must 'bear[] some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband.'" *Belmonte Cardozo*, 181 F.4th at 467-68 (quoting *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019)).

knew he kept," and "creates a copy the government may be able to keep." *Id.* As such, as plaintiff himself agrees, although a forensic search does not require issuance of a traditional warrant upon the showing of probable cause, it does require "individualized suspicion." *Id.*; *Compl.* (Dkt. No. 1), ¶124. By contrast, a mere "manual search" – which "sees only what a user can access" and "ends when the officer's time, patience and attention give out" – requires no suspicion at all. *Belmonte Cardozo*, 181 F.4th at 471.[2]

### B. <u>FIRST AMENDMENT MATERIAL</u>

**1.** Nor does the above rule somehow change when the material that federal law enforcement officials review or access at the border enjoys some form of First Amendment protection. Indeed, the Supreme Court itself has rejected any change to the generally-applicable Fourth Amendment standard under such circumstances:

> [A]n application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally.

*New York v. P.J. Video*, 475 U.S. 868, 875 (1986). As a result of "the Court's reluctance to create a First Amendment exception to the general principles governing warrant applications," the Fourth Circuit concluded that it would be "unlikely that it would favor a similar exception to the border search doctrine." *Ickes*, 393 F.3d at 507. The Fourth Circuit thus refused "to carve out [this] First Amendment exception" to the border search doctrine based on its additional assessment that such an exception would be "staggering" because it would be inconsistent with the very premise of the border search doctrine – particularly the need to "uncover[] terrorist communications" – and "would ensure significant headaches for those forced to determine its

[2]The Fourth Circuit has also held that any extended seizure of a device in order to conduct a forensic search similarly requires individualized suspicion. *See Nkongho*, 107 F.4th at 382.

scope," which "the Supreme Court wished to avoid by sanctioning expansive border searches." *Id.* at 506.

**2.** Outside of the Constitution, however, Congress has provided a modicum of protection for certain types of material. In particular, the Privacy Protection Act ("PPA"), *see* 42 U.S.C. §§ 2000aa, *et seq.*, generally precludes a law enforcement officer from searching or seizing "work product" or "documentary materials" "possessed by a person" "to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication," *id.* §§ 2000aa(a)-(b).

But this statute also has exceptions. As an example, the general prohibition against the seizure of the aforementioned materials does not apply if "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." *Id.* §§ 2000aa(a)(1); (b)(1). More importantly here, the statute has its own exception for what it terms "Border and Customs Searches":

> This chapter shall not impair or affect the ability of a government officer or employee, pursuant to otherwise applicable law, to conduct searches and seizures at the borders of, or at international points of, entry into the United States in order to enforce the customs laws of the United States.

*Id.* § 2000aa-5. There is rather little authority interpreting this particular statutory language. One of the few courts (if not the only) concluded that although the provision "likely does not sweep in all searches and seizures at the border," it does apply to prevent application of the PPA to border searches "in order to enforce the customs laws of the United States." *Madaio v. United States*, 825 F. Supp. 3d 1308, 1318-19 (S.D. Fla. 2026). Under the *Madaio* court's construction, the use of "customs laws" "refer[s] to those laws enforced or administered by the modern agency – Customs and Border Protection ["CBP"]," *id.* at 1324-25 – which would bring within the ambit of the exception any number of statutory provisions, including, *inter alia*, those involving the

interdiction of goods illegally entering the United States, *see* 6 U.S.C. § 211(c)(2); 19 U.S.C. § 1595a; and counterterrorism, *see* 6 U.S.C. §§ 211(c)(5); (g)(3)(A)-(B). And significantly, the law enforcement officer's subjective rationale for conducting the border search is irrelevant so long as there is an objectively reasonable basis for the exception to apply. *See Madaio*, 825 F. Supp. 3d at 1319-20.

### C. CBP DIRECTIVE NO. 3340-049B

Plaintiff also references the most recent iteration of a CBP Directive, entitled "Border Search of Electronic Devices," that "provides guidance and standard operating procedures for searching, reviewing, retaining, and sharing information contained in electronic devices . . . subject to inbound and outbound border searches." CBP Directive No. 3340-049B (Jan. 1, 2026), § 1.1, *available at* <https://www.cbp.gov/sites/default/files/2026-01/cbp_directive_3340-049b_jan_2026_508.pdf> (visited Nov. 7, 2026).[3] The Directive first explains that "border searches are part of CBP's longstanding practice and are essential to enforcing the law at the U.S. border," including, *inter alia*, the "detect[ion] of evidence relating to terrorism and other national security matters" and the "discovery of digital contraband, such as child pornography." *Id.* § 1.2. Notwithstanding this broad enforcement narrative, the Directive continues to provide that "CBP will protect the rights of individuals against unreasonable search and seizure and ensure privacy protections while accomplishing its enforcement mission." *Id.* § 2.1. More substantively, the Directive divides border searches into two categories – "basic" and "advanced" – with the latter

[3]CBP Directive No. 3340-49B serves as the third version of this Directive on the "Border Search of Electronic Devices." CBP issued the first version in August 2009, and the second in January 2018. *See* CBP Directive No. 3340-049 (Aug. 20, 2009), *available at* << https://www.dhs.gov/xlibrary/assets/cbp_directive_3340-049.pdf> (visited Nov. 8, 2026); CBP Directive No. 3340-049A (Jan. 4, 2018), *available at* << https://www.dhs.gov/sites/default/files/publications/CBP%20Directive%203340-049A_Border-Search-of-Electronic-Media.pdf>> (visited Nov. 8, 2026).

type of search defined as "any search in which an officer connects equipment . . . to *copy and/or analyze* the contents of an electronic device"; mere attempts "to bypass a password" with independent equipment "does not constitute an advanced search." *Id.* §§ 3.3-3.4 (emphasis added). An "advanced search," per the Directive, generally requires "reasonable suspicion of activity in violation of the laws enforced or administered by CBP." *Id.* § 5.1.4.

But the Directive itself recognizes that its substantive standards are subservient to the law of the particular jurisdiction in which the border search is conducted:

> CBP conducts border searches in accordance with applicable statutes, regulations, and judicial authorities. Additional or different requirements may apply in certain jurisdictions to ensure compliance with binding circuit precedent. The location where the border search is initiated determines which policy guidance applies.

*Id.* § 2.9. The Directive also expressly provides that it is nothing more than "an internal policy statement" that "does not create or confer any rights, privileges, or benefits on any person or party." *Id.* § 8.1

## II. <u>PLAINTIFF'S COMPLAINT</u>[4]

Plaintiff Max Blumenthal is a journalist who resides in Northern Virginia. *Compl.*, ¶11. Plaintiff explains that his work as a journalist has spanned twenty-five (25) years, and that he has often been "criticized for [his] opposition to United States government policy," *id.* ¶16; in particular, plaintiff avers that at present, he has "devoted considerable focus to the United States' military conduct in Iran," *id.* ¶20.

**a.** In July 2026, plaintiff traveled to Iran. *Id.* ¶35. On July 10, 2026, he returned to the United States, flying through Istanbul, Turkey, with his final destination as Dulles International

[4] It is well-settled that in adjudicating its own jurisdiction over claims contained within a civil complaint, this Court may review materials outside the four corners of that complaint. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). But unless otherwise stated, this factual discussion is derived from the four corners of plaintiff's complaint in this action.

Airport in Virginia. *Id.* ¶42. Subsequent to his arrival at Dulles, plaintiff was directed to secondary screening, where he was questioned by two CBP officers. *Id.* ¶¶45-47. Those CBP officers searched plaintiff's suitcase and carry-on bags – which contained a digital camera, and a laptop computer. *Id.* ¶¶47. At the officers' direction, plaintiff "surrendered" his two smartphones, but refused the officers' request to unlock them and provide their passcodes. *Id.* ¶¶51-52. For that reason, the officers informed plaintiff that CBP "would detain the phones" to attempt a forensic search. *Id.* ¶53. The officers did not detain, or otherwise request access to, plaintiff's laptop computer or digital camera. *Id.* ¶¶51; 55.

On July 17, 2026, CBP contacted plaintiff and informed him that he could pick up his phones at Dulles, which he did; in the process, plaintiff asked the officer with whom he spoke whether any of the material had been copied or spyware had been placed on the phone – the officer answered in the negative. *Id.* ¶¶80-81. As explained in subsequent filings within the miscellaneous action that plaintiff commenced under Federal Rule of Criminal Procedure 41(g), DHS attempted to utilize independent equipment to gain access to plaintiff's smartphones, but were unsuccessful; as such, no forensic search occurred with respect to those smartphones. *Blumenthal v. Mullin*, No. 1:26mc16 (E.D. Va.) (Dkt. No. 13-1).

**b.** Plaintiff first commenced a miscellaneous action in this Court, pursuant to Federal Rule of Criminal Procedure 41(g), seeking the return of his smartphones. *Id.* ¶79; *see also Blumenthal v. Mullin*, No. 1:26mc16 (E.D. Va.). The Government responded to that motion, as required by this Court's order to show cause, explaining that Federal Rule 41(g) only authorized the return of property, and because plaintiff's smartphones had been returned to him, the miscellaneous action should be deemed moot. *Id.* ¶82; *see also Blumenthal* (Dkt. No. 13). In particular, the Government's supplemental response included a declaration that testified to the following:

> Occasionally, this technology is unable to access the connected devices and therefore nothing on the phone is accessible to the DFA [Digital Forensic Analyst]. In this instance, the technology could not access data from Mr. Blumental's phones. Therefore, the DFA was unable to access the contents of either phone, was unable to view any information stored in either phone, and therefore did not copy any of the information from either phone.

*Blumenthal* (Dkt. No. 19-1); *see also Compl.*, ¶¶89-90; 92.

**c.** Plaintiff subsequently filed the instant civil action. Claiming to be "fearful about being stopped and unlawfully searched again," *Compl.*, ¶98, plaintiff seeks entirely equitable relief, *id.* at pp.35-36, based on four claims broadly connected to the detention and unsuccessful attempt to engage in a forensic search of his smartphones. *First*, plaintiff asserts a claim (Count I) directly under the First Amendment, maintaining that CBP's detention and attempted forensic search of his smartphones was premised upon viewpoint discrimination and retaliation against his unflattering journalistic coverage of American policy. *Id.* ¶¶102-18. *Second*, plaintiff asserts a claim (Count II) directly under the Fourth Amendment, maintaining that CBP's actions amounted to an unreasonable search and seizure of his smartphones. *Id.* ¶¶119-29. *Third*, plaintiff asserts a claim (Count III) under the PPA. *Id.* ¶¶130-38. *Fourth*, plaintiff asserts a claim (Count IV) under the Administrative Procedure Act ("APA"), maintaining that CBP's 2026 Directive constitutes unlawful final agency action. *Id.* ¶¶139-48. Although the precise premise of this final APA claim is somewhat unclear, it appears that plaintiff alleges that the Directive is inconsistent with Fourth Circuit authority insofar as it authorizes "the use of forensic technology to provide access to an otherwise inaccessible device." *Id.* ¶¶141; 145-46.

Based on these claims, plaintiff seeks a series of declaratory judgments that his rights under the First and Fourth Amendments, and the PPA, were violated, and two injunctions. *Id.* at pp.35-36. In the first, plaintiff asks this Court to issue a "follow the law" injunction that precludes DHS from "targeting him from seizing, searching, or attempting to seize or search [his] electronic

devices upon entering or leaving the country, or anywhere else, in the absence of individualized suspicion or a warrant based on probable cause." *Id.* at p.36 ¶D. In the second, plaintiff asks this Court to enjoin CBP from enforcing its January 2026 Directive in its entirety. *Id.* at p.36 ¶E.

## ARGUMENT

### I. General Standards

#### A. Federal Rule 12(b)(1)

Federal Rule 12(b)(1) serves as the appropriate vehicle to challenge the court's subject matter jurisdiction in a particular matter. *See, e.g., Coulter v. United States*, 256 F. Supp. 2d 484, 486 n.3 (E.D. Va. 2003), *aff'd*, 90 Fed. Appx. 60 (4th Cir. 2004). The plaintiff bears the burden of establishing the court's subject matter jurisdiction, and although this Court may utilize the allegations contained within the four corners of the plaintiff's complaint as *evidence* in determining whether it possesses jurisdiction over a dispute, it may also consider other evidence outside the pleadings if necessary. *See Richmond, Fredericksburg, & Potomac R.R. Corp. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *Coulter*, 256 F. Supp. 2d at 486 n.3.

#### B. Federal Rule 12(b)(6)

A motion pursuant to Federal Rule 12(b)(6) serves to test the legal sufficiency of the plaintiff's complaint in relation to the factual averments he or she puts forward. Although a court must accept as true all well-pled allegations in adjudicating such a motion, it need not credit allegations that are merely conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (holding that courts adjudicating a Federal Rule 12(b)(6) motion must determine whether the complaint alleges facts that state a plausible claim for relief).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Accordingly, although a court is required to adjudge the factual assertions contained within a complaint against the substantive law governing the claim, where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint fails. *Id.* at 679 (emphasis added).

## I. PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE

### A. EACH OF PLAINTIFF'S CLAIMS FAIL FOR LACK OF STANDING

It is well-established that, pursuant to Article III of the federal Constitution, this Court's jurisdiction extends only to "cases or controversies." U.S. Const. art. III; *see also Whitmore v. Arkansas*, 495 U.S. 149, 154-55 (1990) ("Article III, of course, gives the federal courts jurisdiction over only 'cases or controversies' . . . ."). The "case or controversy" requirement has given rise to several so-called "justiciability" doctrines that implicate this Court's ability to entertain a given claim. *See generally* Erwin Chemerinsky, FEDERAL JURISDICTION § 2.1 (2d ed. 1994). One such justiciability doctrine – derived from the Constitution – is the tenet of standing.

In order to demonstrate the "irreducible constitutional minimum" of standing, a plaintiff must establish the following:

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Dixon v. Edwards*, 290 F.3d 699, 711 (4th Cir. 2002). The law of standing is built on separation-of-powers principles and, as such, the inquiry is "especially rigorous when reaching the merits of the dispute would

force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (holding that without an "imminent" and "concrete" injury, "allowing courts to oversee legislative or executive action 'would significantly alter the allocation of power . . . away from a democratic form of government'" (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)).

Because plaintiff exclusively requests equitable relief that is forward-looking, he "must face 'a real and immediate threat of repeated inquiry.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)); *see also Spurlock v. Wexford Health Servs., Inc.*, 175 F.4th 232, 245 (4th Cir. 2026). In this regard, Plaintiff first alleges that because, in his view, "CBP disregarded his rights in conducting the search initially . . . he has every reason to believe his rights will be violated again." *Compl.*, ¶99.[5] But the Supreme Court has rejected such allegations as insufficient to establish standing, holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *O'Shea*, 414 U.S. at 495-96; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).[6] Instead, those "who have suffered a past

---

[5]Plaintiff does not allege that federal officials are currently intercepting his communications; rather, his allegations are premised solely upon the prior border search. *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 211-12 (4th Cir. 2017).

[6]In *Lyons*, the Supreme Court considered whether a plaintiff subjected to a chokehold by police had standing to seek equitable relief in the form of (1) a declaration that the use of such chokeholds violated the Constitution and (2) an injunction against their future use. *See Lyons*, 461 U.S. at 98. The Court explained that plaintiff would have standing to present his claims for equitable relief only if he could show that he "would again be stopped for a traffic or other violation in the reasonably near future" and "that strangleholds are applied by the Los Angeles police to every citizen who is stopped and arrested regardless of the conduct of the person stopped." *Id.* at 108. Noting that the plaintiff did not claim to have been subjected to a chokehold on any other occasion, the Court found that the "odds" of a repeat occurrence of the allegedly illegal conduct were not "sufficient to make out a federal case for equitable relief." *Id.*

harm . . . cannot seek injunctive relief against future [harm] unless a recurrence is *likely*." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023) (emphasis added). And here, that means that plaintiff must demonstrate that it is *likely* not only that he will be subjected to another border search in the imminent future, but that such an imminent border search will be unlawful. In essence, that *whenever* he travels abroad for *whatever* reason, it is likely that he will be subjected to an unlawful border search.

Plaintiff cannot satisfy that significant burden here. As an initial matter, it is extremely unlikely that any individual passenger would have his or her electronic devices searched by CBP officers upon crossing the functional border at an international airport. The Fourth Circuit has itself rejected the suggestion that "any person carrying a laptop computer … on an international flight would be subject to a search of the files on the computer hard drive" – going so far as to call it "far-fetched" – because "[c]ustoms agents have neither the time nor the resources to search the contents of every computer." *Ickes*, 393 F.3d at 506-07. And the district court's analysis in *Abidor v. Napolitano*, 990 F. Supp. 2d 260 (E.D.N.Y 2013), is particularly instructive on this score. There, a CBP officer searched plaintiff's electronic devices when returning to the United States from abroad. *Id.* at 267-68. The *Abidor* court dismissed plaintiff's claims for declaratory and injunctive relief, taking judicial notice that "there is less than one in a million chance that a computer carried by an inbound international traveler will be detained" by CBP. *Id.* at 271. Given these low odds – as the Fourth Circuit also recognized in *Ickes* – it was nothing more than speculation whether the same conduct would again "occur at some unspecified future date," which was insufficient to support Article III standing. *Id.* at 272.

And so it is here. Indeed, plaintiff openly alleges that he has traveled internationally on numerous occasions, including *to Iran* in February 2025 – during the current presidential

administration and while his reporting presumably was not complimentary of United States policy decisions – without incident. *Compl.*, ¶33. The chances that plaintiff will again be subjected to a CBP border search, let alone in the immediate future, is thus extremely low. Because this comes nowhere close to the type of "*likely*" recurrence of the same injury required by binding authority, his claims should be dismissed.

Based on his complaint, plaintiff ostensibly believes that he can overcome this significant hurdle for two reasons: (1) the hyperbolic commentary of a non-government actor that plaintiff calls a "social media influencer"; (2) plaintiff's own personal decision to eschew certain international travel and communications. Neither of these groups of allegations assist plaintiff in creating an Article III "case or controversy."

**1.** Plaintiff initially alleges that a so-called "social media influencer" named Laura Loomer – who, he avers, has close relationships with certain Executive Branch officials – has repeatedly published statements adverse to him, including those that call for law enforcement action against him, on the social media network "X." *Compl.*, ¶¶57-76. These online statements, plaintiff maintains, renders him "fearful" of being stopped and unlawfully searched again by CBP. *Id.* ¶98. For a number of reasons, these allegations bring plaintiff no closer to demonstrating that another CBP border search of his electronic devices, let alone an *unlawful* border search, is "*likely*" to occur.

*First*, Loomer is not a government official of *any* kind, let alone one employed by CBP; rather, as plaintiff readily articulates, she is "a prominent social media influencer." *Id.* ¶3. And for that reason alone, her commentary should not be attributed to "predict" how a particular government agency – or group of government officials – *might* act in the future, much less how they are *likely* to act in the future. *Cf. Adirim v. Central Intelligence Agency*, 2026 WL 525099,

at *10 (E.D. Va. Feb. 25, 2026) (recognizing that online commentary by Donald Trump, Jr., as one who "does not work for the government," cannot be attributed to a federal agency for purposes of a due process claim).

*Second*, the hyperbolic nature of Loomer's commentary with respect to plaintiff (and plaintiff's retorts in kind[7]), cannot be overstated. According to plaintiff's complaint, Loomer advocated for the following to occur to plaintiff: (1) to be "take[n] . . . off the plane by U.S. Marshals"; (2) to have his passport revoked (twice); (3) to be the subject of a "heavily armed raid by [the] FBI at 5AM": (4) to be charged and prosecuted; and (5) to "go to prison." *Compl.*, ¶¶61-62; 67. Plaintiff does not allege that any of these things have happened. And thus, again, Loomer's social media posts do not make it "likely" that the federal law enforcement apparatus is going to take any further action against plaintiff, let alone that CBP is *likely* to engage in a future border search – without the necessary individualized suspicion[8] – of plaintiff's electronic devices.

---

[7]Certain of Loomer's comments were in response to other commentary on the part of plaintiff, and thus appear to be a part of a larger feud. *See* Laura Loomer (@LauraLoomer), X (Jul. 7, 2026, at 5:03 PM) https://x.com/LauraLoomer/status/2074600105060036620 (last visited Nov. 9, 2026), *quoted in Compl.*, ¶62; *see also* Laura Loomer (@LauraLoomer), X (Jul. 14, 2026, at 5:24 PM), https://x.com/LauraLoomer/status/2077142253831594216?s=20 (last visited Nov. 9, 2026), *quoted in Compl.*, ¶67. For this reason, leaving aside the other bases identified in this memorandum, to the extent that these social media posts were reactionary to plaintiff's commentary, they certainly cannot have any actual predictive value about actions that Executive Branch agencies might take in the future.

[8]In this respect, defendants are not suggesting – much less admitting – that there was a lack of individualized suspicion in the attempted forensic search that CBP conducted in July 2026 upon plaintiff's return to the United States from Iran. Given that the instant motion is brought pursuant to Federal Rule 12, defendants are limited to the four corners of plaintiff's complaint. The point is simply that plaintiff's standing burden is not just that he will be subjected to another border search in the imminent future, but that such an imminent border search will be conducted without adherence to constitutional strictures.

*Third*, even if Loomer's social media posts could somehow be predictive of what CBP is *likely* to do in the imminent future for purposes of this Court's constitutional jurisdiction, the *context* of those posts is significant. To the extent that those social media posts made threats to plaintiff, they discussed a *single* topic – plaintiff's recent trip to Iran, positing that plaintiff accepted payment for the trip from Iran itself in violation of sanctions law. *Id.* ¶62. But as plaintiff openly acknowledges in his complaint, and as he informed the CBP officers with whom he interacted at Dulles during the border search at issue here, he has no "plans to return to Iran soon." *Id.* ¶49; *see also id.* ¶¶100-01 (averring that plaintiff had questioned whether to travel to the Netherlands and Nicaragua).

In the end, Loomer's hyperbolic back-and-forth with plaintiff does not make it *likely* that CBP will engage in an unlawful border search of plaintiff's electronic devices in the imminent future; indeed, quite to the contrary, they make a future unlawful border search "no more than conjecture." *Lyons*, 461 U.S. at 108.

**2.** Plaintiff next suggests that he can demonstrate his standing for forward-looking equitable relief based on the cautionary measures that he has elected to take in the wake of the previous CBP border search; namely, limiting his communications with certain sources and questioning whether to travel internationally to the Netherlands and Nicaragua. *Id.* ¶¶97; 100-01. But the Supreme Court has itself rejected such "allegations of a subjective chill" on a plaintiff's behavior as sufficient to establish standing, explaining that they "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Clapper*, 568 U.S. at 418 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Plaintiff's own subjective decisions cannot create the present objective harm needed to vest this Court with constitutional jurisdiction over his claims.

* * *

In the end, none of the allegations contained within plaintiff's complaint demonstrate an "actual or imminent" injury. And as such, this Court lacks jurisdiction over the entirety of that complaint, and it should dismiss the same pursuant to Federal Rule 12(b)(1).

**B. <u>EQUITABLE CONSIDERATIONS SUPPORT A LACK OF STANDING</u>**

Moreover, even if plaintiff could establish Article III standing, dismissal would still be warranted for closely related equitable reasons. As the Supreme Court held long ago:

> A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest. It is always the duty of a court of equity to strike a proper balance between the needs to the plaintiff and the consequences of giving the desired relief.

*Eccles v. Peoples Bank of Lakewood Vill.*, 333 U.S. 426, 431 (1948) (citations omitted). Accordingly, "[e]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Id.*; *see also Abidor*, 990 F. Supp. 2d at 274 ("'The Supreme Court has frequently, although not invariably, indicated a marked reluctance to have important issues of public law resolved by declaratory judgments.'" (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 2762 (3d ed. 1998)). Put more palpably in terms of the instant action, although in some instances it may be necessary for a court to address the legality of a border search (such as in a criminal prosecution where an individual's liberty may hinge on whether evidence discovered during a border search of an electronic device is suppressed), plaintiff's complaint does not present such a case. *See Abidor*, 990 F. Supp. 2d at 272 (contrasting a claim for a declaratory judgment regarding the legality of a border search, for which standing was lacking, with that same issue being raised in a criminal case in the context of a motion to suppress).

In addition, as the *Abidor* court noted, declining to exercise discretionary equitable jurisdiction over plaintiff's claims affords Congress and the relevant Executive Branch agencies the first opportunity to "respond to any abuses that should develop as a consequence" of government policies providing for border searches of electronic devices. *Id.* at 274. As plaintiff here recognizes, *Compl.*, ¶28, the current CBP Directive on border searches of electronic devices makes clear that "CBP will protect the rights of individuals against unreasonable search and seizure and ensure privacy protections while accomplishing its enforcement mission," and thus CBP uses such searches "judiciously." CBP Directive No. 3340-049B, §§ 2.1; 4.5. Congress is likewise aware that electronic devices are subject to being searched at the border but has not seen fit to withdraw or modify the broad search authority that it has consistently granted to government officers at the border for well over 200 years (including at the time the Fourth Amendment was adopted). *See Abidor*, 990 F. Supp. 2d at 274 (referencing a congressional report on border searches of electronic devices); *see also* Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, § 802 (2016), codified at 6 U.S.C. § 211(k)(1)(A) (directing CBP to establish "standard operating procedures for searching, reviewing, retaining, and sharing information contained in communication, electronic, and digital devices encountered by [CBP] personnel at United States ports of entry").

For these reasons, this Court should not exercise its authority to entertain issuance of a declaratory judgment here.

### C. PLAINTIFF SPECIFICALLY LACKS STANDING TO PRESENT HIS APA CLAIM REGARDING THE CBP DIRECTIVE

The above standing issues apply to each of plaintiffs' several claims. But there is a particular standing problem with plaintiff's fourth and final claim – his putative APA challenge to the current CBP Directive on border searches of electronic devices. Put simply, even assuming

that plaintiff could demonstrate that he is *likely* to be injured in the imminent future by an unlawful border search, he cannot demonstrate that an order enjoining the CBP Directive will cure (or, in standing parlance, "redress") that putative injury.

As noted previously, a plaintiff must establish the three elements of the standing framework – injury in fact, causation, and redressability. With respect to the final element, plaintiff must demonstrate that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)); *see also Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). Plaintiff's contention with respect to the Directive is that it authorizes the use of external equipment to access an unlocked electronic device upon a showing of individualized suspicion, in purported violation of Fourth Circuit authority. *Compl.*, ¶141. Although that assessment is itself erroneous, *see infra* Part II.B, any invalidation of the Directive or injunction precluding its application will not redress plaintiff's putative injury – the use of external equipment to access an unlocked device. This is because the authority to perform border searches does not come from this Directive. *See Flores-Montano*, 541 U.S. at 152-53 ("Time and again, we have stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977))); *see also, e.g.*, 19 C.F.R. § 162.6 ("All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer."). Indeed, federal law enforcement officials – including from CBP – have been performing border searches since well before the first CBP Directive on this topic was issued in 2009. *See, e.g.*, *Flores-Montano*, 541

U.S. at 153 (noting the "impressive historical pedigree" of border searches); *Ickes*, 393 F.3d at 505-06 (approving constitutionality of border search of computer). Eliminating the Directive (or its application) would not eliminate border searches of electronic devices, and thus would not redress plaintiff's putative injury to that effect.[9]

Plaintiff thus lacks standing to present his APA challenge to the CBP Directive.

## II. PLAINTIFF'S CLAIMS FAIL ON THEIR MERITS

Even if plaintiff could somehow demonstrate standing to present his claims and vest this Court with constitutional jurisdiction over this action, certain of plaintiff's causes of action fail to state a plausible claim, and thus should be dismissed pursuant to Federal Rule 12(b)(6).

### A. PLAINTIFF HAS NOT PLED A PLAUSIBLE FIRST AMENDMENT VIEWPOINT/RETALIATION CLAIM

As noted above, plaintiff asserts a claim under the First Amendment, alleging that CBP officers carried out the July 2026 border search in retaliation for the viewpoint that he expressed in his journalistic efforts; namely, criticism of the United States' foreign policy. *Compl.*, ¶¶105-18.[10] In order to state a claim for First Amendment retaliation, a plaintiff must plead non-

---

[9]Indeed, even the Directive *itself* recognizes that the authority to perform border searches, and the means that can be employed in performing them, is governed by "binding circuit precedent" and not the Directive: "Additional or different requirements may apply in certain jurisdictions to ensure compliance with binding circuit precedent." CBP Directive 3340-049B, § 2.9.

[10]Plaintiff, in fact, has expressly titled this claim "Unlawful Viewpoint Discrimination and Retaliation." *Compl.*, p.27. There is a suggestion in one of plaintiff's allegations, however, that to the extent that CBP officials were interested in identifying one or more of his sources (even if for evidence of criminal conduct in which they may have engaged) through its border search, because that information enjoys some modicum of First Amendment protection, the attempt to identify a source is itself constitutionally violative. *Id.* ¶115. But the Fourth Circuit has rejected this position, declining to "carve out a First Amendment exception to the border search doctrine" through which materials protected by the First Amendment have a "sanctuary at the border." *Ickes*, 393 F.3d at 506; *cf. George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013).

conclusory factual allegations that would render the following elements plausible: "(1) the plaintiff 'engaged in protected First Amendment activity,'; (2) 'the defendants took some action that adversely affected [the plaintiff's] First Amendment rights,'; and (3) 'there was a causal relationship between [the plaintiff's] protected activity and the defendants' conduct.'" *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)).

Plaintiff's complaint here falls short on the final causation element. In this respect, plaintiff must plausibly allege that "his exercise of his First Amendment rights was a substantial or motivating factor" in CBP's decision to conduct a border search. *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 654 (4th Cir. 2017). But here, plaintiff notes that in February 2025 – during the current presidential administration and while his journalistic efforts were critical of American foreign policy – he not only traveled abroad, but traveled to Iran, without incident (or, at least, without a border search upon his return to the United States). *Id.* ¶¶33-34. And although plaintiff suggests that CBP's lack of interest in his digital camera and laptop computer supports his theory of First Amendment animus, *id.* ¶115, the reasonable inference is to the contrary; *i.e.*, if CBP officers sought to harass plaintiff based on their putative animus towards the subject-matter and inclination of plaintiff's journalistic efforts, they would not have limited the scope of their search. That CBP's border search here was more targeted thus renders implausible that their actions were motivated by animus, and instead indicates that CBP's actions were for a more precise purpose.

It thus appears that plaintiff rests much of his retaliation claim on the same Loomer social media posts described above – and many of the same reasons for which those posts do not assist plaintiff in establishing standing also apply here to prevent plaintiff from stating a plausible First

Amendment claim. *See supra* Part I.A. These statements were not made by CBP officers, but by a "social media influencer." To the extent that plaintiff's complaint attempts to draw a connection between the Loomer social media posts and the decision made by the relevant CBP officers, it is nothing more than speculation. *See Twombly*, 550 U.S. at 555 (holding that to present a plausible claim "[f]actual allegations must be enough to raise a right to relief above the speculative level") The complaint does not allege that the relevant CBP officers were aware of those posts much less that Plaintiff's protected viewpoints or journalistic activities were a substantial or motivating factor in CBP's decision to conduct the border search.

Because the non-conclusory factual allegations contained within plaintiff's complaint is only "'merely consistent with' defendants' liability," *Iqbal*, 566 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557), this Court should dismiss plaintiff's First Amendment retaliation claim pursuant to Federal Rule 12(b)(6).

### B. PLAINTIFF HAS NOT STATED A PLAUSIBLE APA CLAIM WITH RESPECT TO THE CBP DIRECTIVE

As explained above, plaintiff lacks standing to present his challenge – brought pursuant to the APA – to the CBP Directive on border searches of electronic devices, either because he cannot demonstrate a constitutionally-cognizable injury in fact or that any such injury would be remedied by an injunction precluding application of the Directive. But even if plaintiff could surmount these significant threshold problems, he has to face another – whether he has pled a plausible APA challenge to the Directive. Several reasons require this question to be answered in the negative.

**1.** *First*, the APA provides for judicial review of final agency action only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. Put simply, where there is another mechanism by which an entity can obtain Article III review of a particular "final agency action," "APA review

[is] precluded because 'Congress did not intend to permit a litigant challenging an administrative denial . . . to utilize'" both the alternative mechanism "'and the APA.'" *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (quoting *Env't Def. Fund v. Reilly*, 909 F.2d 1497, 1501 (D.C. Cir. 1990)). As such, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *El Rio*, 396 F.3d at 1272).

Plaintiff here seeks to challenge a particular provision of the 2026 CBP Directive. But the premise of that challenge is identical to plaintiff's Fourth Amendment claim for equitable relief; *i.e.*, that CBP's attempt to conduct a forensic review of his electronic devices is unconstitutional. If plaintiff could establish his standing for such a claim, and ultimately succeed on the merits of the same, that constitutional challenge would provide the same genre of relief as his requested relief under the APA. Plaintiff's APA claim is thus barred by § 704. *See generally Anibowei v. Mayorkas*, 2024 WL 4887525, at *6 (N.D. Tex. Nov. 22, 2024) (dismissing APA challenge because plaintiff had an adequate alternative remedy in the form of a constitutional claim), *aff'd on other grounds*, 2025 WL 3231720 (5th Cir. Nov. 19, 2025).

**2.** As this Court is well aware, when a litigant brings an APA challenge, "[t]he entire case on review is a question of law, and only a question of law." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see also* 5 U.S.C. § 706(2)(A) (authorizing Article III courts to "set aside" "final agency action" when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Plaintiff's instant APA claim is no different, as he questions the legal validity of a nuanced portion of the Directive:

> The Directive's distinction between basic and advanced searches broadly mirrors the Fourth Circuit's distinction between manual searches requiring no individualized

> suspicion, and forensic searches which do require such suspicion, but is not identical insofar as CBP's directive permits the use of forensic technology to provide access to an otherwise inaccessible device.

*Compl.*, ¶141. Because, in plaintiff's view, "the Fourth Circuit" does not "permit the use of forensic technology to provide access to an otherwise inaccessible device," "CBP's Directive therefore conflicts with the law of this Circuit." *Id.* ¶¶145-46.

Even assuming that plaintiff's assessment of Fourth Circuit authority is correct – and it is not – that does not render the Directive "contrary to law" and thus subject to being "set aside" by this Court. That is so because the Directive *itself* recognizes, and takes cognizance of, differences in circuit authority on the proper limits of a border search:

> CBP conducts border searches in accordance with applicable statutes, regulations, and judicial authorities. Additional or different requirements may apply in certain jurisdictions to ensure compliance with binding circuit precedent. *The location where the border search is initiated determines which policy guidance applies*.

*CBP Directive* 3340-049A, § 2.9 (emphasis added). Put simply, the Directive incorporates by reference the very Fourth Circuit authority that plaintiff alleges to exist – and if that authority provides that forensic technology cannot be used as a part of a border search, the Directive precludes its use. That alone renders plaintiff's APA claim implausible, and thus subject to dismissal.

In any event, Fourth Circuit authority *does not* prohibit the use of forensic technology to access an otherwise inaccessible electronic device (*i.e.*, one that its owner has refused either to open him or herself or to provide its passcode). To be sure, although undersigned counsel is unaware of any Fourth Circuit decision confronting this *precise* question, its answer follows unequivocally from current Fourth Circuit authority on the forensic review of electronic devices as a part of a border search. As noted above, the Fourth Circuit has held that a forensic review of an electronic device as a part of a border search is considered "non-routine," and thus law

enforcement personnel may conduct such a forensic review so long as they have individualized suspicion. *See Kolsuz*, 890 F.3d at 146 ("[W]e think it is clear that a forensic search of a digital phone must be treated as a nonroutine border search, requiring some form of individualized suspicion.").[11] The Fourth Circuit thereafter differentiated forensic review from so-called "manual" review; *i.e.*, the review of an electronic device by an individual *after* the owner of the device either unlocks it or provides its passcode. *See Belmonte Cardozo*, 181 F.4th at 470-72. And of premier importance here, the Fourth Circuit explained the intrusive nature of a forensic review, thus requiring some form of individualized suspicion; among other things, the court provided as follows:

> [A] manual search sees only what a user can access on a device. A forensic search recovers more – deleted files, cached fragments, location histories, system logs and metadata *the owner never knew he kept*. . . . Thus, a forensic search exposes not just what an ordinary user would consider to be the contents of a phone; it opens a window beyond.

*See id.* at 471 (emphasis added); *see also Aigbekaen*, 943 F.3d at 718 n.2 (recognizing that a forensic search can "unlock[] password-protected files, restor[e] deleted material, and retriev[e] images viewed on websites").[12] If the Fourth Circuit has held a forensic search permissible as a part of border search upon individualized suspicion, and that forensic search can both "unlock password-protected files" and reveal information on a device that "the owner never knew he

---

[11]Indeed, in so holding, the Fourth Circuit expressly cited the fact that the previous version of the CBP Directive treated forensic review of electronic devices at the border as "non-routine" searches that require individualized suspicion. *See Kolsuz*, 890 F.3d at 146 (citing CBP Directive No. 3340–049A, *Border Search of Electronic Devices* (2018)).

[12]In fact, the Fourth Circuit has expressly recognized that "the government's interests at the border are paramount," and "forensically searching a traveler's electronic devices may be vital to promoting those interests." *Nkongho*, 107 F.4th at 382.

kept," it is *a fortiori* permissible for that same forensic search to gain simple access to a "locked" device.[13]

In short, Fourth Circuit authority does *not* prohibit the use of a forensic search to review the contents of an otherwise inaccessible device. Plaintiff's APA claim should therefore be dismissed for failure to state a plausible claim pursuant to Federal Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, this Court should dismiss plaintiff's complaint for a lack of subject-matter jurisdiction or failure to state a plausible claim upon which relief can be granted.

Respectfully submitted,

TODD BLANCHE
ATTORNEY GENERAL

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED STATES ATTORNEY

/s/
DENNIS C. BARGHAAN, JR.
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

ATTORNEYS FOR DEFENDANT

Date: November 9, 2026

[13]Even if plaintiff – despite the precise language of his complaint – is alleging that the Fourth Circuit requires individualized suspicion for federal law enforcement officials to utilize outside equipment to bypass a locked device and conduct a manual search, the law of the Fourth Circuit suggests otherwise. *See Belmonte Cardozo,* 181 F.4th at 471 (discussing what differentiates a "forensic search" from a "manual search"); *see also Kolsuz*, 890 F.3d at 146.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing ("NEF") to the following:

Hassan Minhaj Ahmad
The HMA Law Firm PLLC
6 Pidgeon Hill Drive, Suite 330
Sterling, Virginia 20165
Email: hma@hmalegal.com

Date: November 9, 2026

______/s/______________________

DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

ATTORNEYS FOR DEFENDANT